## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Katch, LLC, f/k/a Vantage Media, LLC,<br><br>     Plaintiff,<br><br>v.<br><br>Jeff Sweetser,<br><br>     Defendant. | Case No. 15-cv-3760 (SRN/JSM)<br><br>**MEMORANDUM OPINION AND ORDER** |

Jillian M. Flowers and V. John Ella, Jackson Lewis P.C., 225 S. 6th St., Ste. 3850, Minneapolis, MN 55402 for Plaintiff.

David G. Waytz and Teresa M. Thompson, Fredrikson & Byron, P.A., 200 S. 6th St., Ste. 4000, Minneapolis, MN 55402 for Defendant.

SUSAN RICHARD NELSON, United States District Judge

   This matter is before the Court on Plaintiff Katch, LLC's ("Katch") Motion for Preliminary Injunction and Expedited Discovery ("Motion") [Doc. No. 5]. For the reasons stated below, Katch's Motion is denied.

## I.  BACKGROUND

### A. Katch, Its Business, and the Controversy Regarding "Confidential Information"

   Katch is a California limited liability company primarily based out of California.[1] (Verified Complaint ("Compl.") at ¶ 2 [Doc. No. 1].) Katch is an online advertising service that primarily assists insurance companies (called "advertisers") with placing

---

[1] Until recently, Katch was known as Vantage Media, LLC. (Compl. at ¶ 3.)

their ads on third-party websites (called "publishers"). (Compl. at ¶¶ 7–9.) In essence, Katch is an intermediary between advertisers and publishers. (Id. at ¶ 8.) Katch's objective, and the service it provides, is to connect advertisers with publishers who will get ads in front of numerous potential insurance customers, especially those customers most likely to "click" on an ad. (See id. at ¶¶ 12, 14, 22.) A large part of Katch's business is located within the health and life insurance industries (referred to as "verticals"). (Id. at ¶¶ 9, 25.)

Katch assists advertisers in placing their ads by employing a software platform ("Katch Platform") that offers "bid control, analytics, testing, integration, workflow, and customization features for both advertisers and publishers." (Id. at ¶ 7.) The Katch Platform uses an algorithm to tailor which ads are shown to which consumers on the publisher's website based on basic data provided by a consumer visiting the publisher's website and data about various advertisers' insurance products. (See id. at ¶¶ 13–14.) The Katch Platform is periodically "adjusted and tweaked" by certain Katch employees including, until recently, Defendant Jeff Sweetser ("Sweetser") "based on real-time performance data and confidential and trade secret information . . . ." (Id. at ¶ 13.)

How many consumers delivered to an advertiser through ads on a particular publisher's webpages actually become insurance customers ("Conversion Data") is tracked by Katch. (Id. at ¶ 15.) Katch then uses this Conversion Data to determine the most efficient and productive publishers (referred to as "Quality Publishers"). (Id.) Knowing which publishers are Quality Publishers, according to Katch's Platform, is important to how Katch profits from its position between advertisers and publishers.

Advertisers submit bids to Katch for their ads to be placed on publisher's websites using the Katch Platform. (See id. at ¶ 11.) These bids are usually expressed on a "per click" basis, meaning the advertiser only pays when an individual actually clicks on, or interacts with, the ad.[2] (Id. at ¶ 12.) Katch charges advertisers more than it pays publishers per click (this difference is referred to as the "Margin"). (Id. at ¶ 18.) It can do so because of the value added by the Katch Platform. (Id. at ¶ 19.) Although advertisers and publishers can track some performance measures through Katch, they do not have access to the same information. (Id. at ¶¶ 16–17.) For instance, advertisers do not generally know who the Quality Publishers are, or what publishers are paid per click by Katch, and publishers do not know what advertisers bid to Katch, or how they are performing for specific advertisers. (See id. at ¶¶ 16–17, 22.) Katch can charge advertisers more to have their ads displayed with Quality Publishers because such ads produce better results for the advertiser.[3] (Id. at ¶ 22.)

Katch describes the confidential information it uses in the above system as:

(A) How much Katch has offered in the past for the opportunity to display advertisements on a publisher's website;

(B) Who the preferred, quality publishers are, based on their track

_____

[2] There are other forms of bidding and factors that go into determining the bid amount. (See Compl. at ¶ 12.) However, the "per click" means of assessing Katch's business is the primary focus of this suit.

[3] The Katch Platform is employed not only in placing particular ads with particular publishers based on the individual consumer, but also in determining the amount Katch pays a publisher per click. (See Compl. at ¶¶ 12–13, 15, 20, 22; Supplemental Declaration of Patrick Cross at ¶ 6 [Doc. No. 18].) Presumably, not only does Katch charge advertisers more for placement with Quality Publishers, but it also pays Quality Publishers more to retain their business.

record and the value delivered to advertisers and Katch;

(C) Which publishers have the capacity to handle a certain volume of ads;

(D) Which publishers are particularly vulnerable to price competition; and

(E) What the advertisers are willing and have been willing to pay based on Conversion Data.

(Compl. at ¶ 20.)  In supplemental documentation,[4] Katch focuses more specifically on two pieces of information it claims are confidential trade secrets: the identity of its Quality Publishers (specifically the top eight publishers) and the amount Katch pays its publishers (referred to as the "average revenue per query") (collectively, "Confidential Information").  (Supplemental Declaration of Patrick Cross ("Supp. Cross Dec.") at ¶¶ 2–7 [Doc. No. 18].)

Katch claims to have expended millions of dollars and considerable amounts of time and resources developing the Confidential Information.  (Compl. at ¶ 28.)  As a result, "Katch has undertaken consistent efforts to maintain the secrecy of" the Confidential Information.  (Id. at ¶ 29.)  For instance, Katch requires its publishers to sign confidentiality agreements stating they will not disclose Katch's prices to third parties.

---

[4] Sweetser argues this supplemental documentation was improper under D. Minn. L.R. 7.1(c)(3)(B) and the Court's Scheduling Order [Doc. No. 12] because it was filed one day before his response briefing was due.  (Defendant's Memorandum in Opposition to Plaintiff's Motion for a Temporary Injunction at 2 n.3 [Doc. No. 19].)  Despite this objection, Sweetser addressed the supplemental materials on their merits.  (See generally id.)  Katch's filing of supplemental documentation in this fashion, without the Court's permission, runs afoul of D. Minn. L.R. 7.1(c) and the Court's Scheduling Order. However, this supplementation was an attempt to focus the Court's attention on two particular pieces of information related to or derived from the confidential information described in the Complaint.  (See Compl. at ¶ 20.)  Despite the late supplementation, the court will consider these materials.

(Ex. 1 to the Second Supplemental Declaration of Patrick Cross ("Publisher Agreement") at 3 [Doc. No. 30-1].[5])   Furthermore, Katch employees are required to sign confidentiality agreements in which they agree not to disclose Katch's confidential or trade secret information.   (Compl. at ¶ 29; Ex. 1 to Compl. ("Confidentiality Agreement") at 1 [Doc. No. 1-1].[6])   However, Katch acknowledges that "small changes in the marketplace" lead to Confidential Information from a particular time losing relevance such that after six months it would "lose much, but not all, of its value . . . ."   (Compl. at ¶ 26.)

According to Katch, if a competitor knew the price it paid to publishers, the competitor could "start at the finish line" and immediately win over Katch's publishers by outbidding Katch.  (See Compl. at ¶¶ 26–27.)  Similarly, knowing the identity of the Quality Publishers would allow a competitor to attract more bids at higher prices from advertisers, assuming the competitor could win over those publishers.  (See Declaration of Patrick Cross ("Cross Dec.") at ¶ 10 [Doc. No. 9].)  Keeping Katch's competitive edge over its rivals by safeguarding the Confidential Information is especially important during the open enrollment periods for health insurance under the Affordable Care Act and Medicare, which occur in the last few months of each year.  (See Cross Dec. at ¶ 9.)

### B.  Sweetser and MediaAlpha

Sweetser lives and works in Minnesota.  (Compl. at ¶ 4.)  He has worked in the

---

[5] The Publisher Agreement is not paginated, thus the ECF page numbers are referenced.

[6] The Confidentiality Agreement is not paginated, thus the ECF page numbers are referenced.

online advertising industry since 2006.  (Declaration of Jeff Sweetser ("Sweetser Dec.") at ¶ 3 [Doc. No. 20].)  His first job was with a firm called QuinStreet, Inc. ("QuinStreet"), which is a direct competitor of Katch.  (Sweetser Dec. at ¶ 3.)  During his first six years in the industry, Sweetser claims to have developed considerable knowledge and expertise about the online advertising marketplace including: "how advertisers and publishers interact . . . how to develop relationships with publishers, how to find potential publishers, and how to effectively sell online advertising."  (Id. at ¶ 5.)

In 2012, Katch recruited Sweetser and he joined the company as a Senior Manager of Business Development.  (Id. at ¶ 4; Compl. at ¶¶ 30–31.)  He was later promoted to Senior Director of Business Development.  (Sweetser Dec. at ¶ 4; see Compl. at ¶ 31.)  Sweetser's job at Katch "was to use his intimate knowledge of Katch's [Confidential Information] to run the publisher side of the health insurance vertical . . . ."  (Compl. at ¶ 31.)

As a condition of his employment with Katch, Sweetser signed an Employee Proprietary Information and Inventions Agreement ("Confidentiality Agreement").  (See Compl. at ¶ 29; Confidentiality Agreement.)  The Confidentiality Agreement requires that Sweetser not disclose or use any of Katch's Proprietary Information after his employment ends.  (Confidentiality Agreement at 1.)  "Proprietary Information" is defined, in relevant part, as "all confidential and/or proprietary knowledge, data, or information of [Katch] . . . include[ing] . . . trade secrets . . . and (b) information regarding . . . prices and costs, suppliers and customers . . . ."  (Id.)  Importantly,

Sweetser did **not** sign any sort of non-compete or non-solicitation agreement.[7]

In mid-September 2015, Sweetser informed Katch of his intention to leave the company later that month and go to work for MediaAlpha, LLC ("MediaAlpha"). Sweetser would hold a similar, if not identical, position at MediaAlpha. (Compl. at ¶ 35.) MediaAlpha is a direct competitor of Katch for online advertising in the health insurance vertical. (Id. at ¶¶ 37, 39, 41.) Previously, in 2014, MediaAlpha hired away two other Katch executives, Keith Cramer ("Cramer")[8] and Michael Foster ("Foster"). (Id. at ¶ 43.) Cramer contends that while he and Foster worked for Katch, they were exposed to the same sorts of Confidential Information as Sweetser and signed confidentiality agreements nearly identical to the one Sweetser signed. (See Declaration of Keith Cramer ("Cramer Dec.") at ¶¶ 7, 14.) Despite these facts, there is no indication Katch sought legal recourse against either Cramer or Foster, nor is there any allegation either disclosed any of Katch's confidential information.

After Sweetser announced his departure, Katch attempted to convince him to stay. First, Sweetser claims Katch offered him "a substantial bonus" if he would sign a non-compete and not work for MediaAlpha or another online advertising platform for a year. (Sweetser Dec. at ¶ 10.) Sweetser declined this offer. (Id.) Katch then offered Sweetser

---

[7] When asked at the hearing why Katch did not have Sweetser sign a non-compete agreement, Katch's counsel said that because Katch is a California company, and California does not allow non-compete agreements, Katch did not think to do so.

[8] Katch refers to a "Keith Kramer," (see, e.g., Compl. at ¶¶ 43–45), but it appears Mr. Cramer's name is spelled "Cramer" as reflected in his Declaration, (see generally, Declaration of Keith Cramer [Doc. No. 21]).

twice his normal salary for three months if he would "sit out" during that time and not work for either Katch or MediaAlpha. (Sweetser Dec. at ¶ 10; Cross Dec. at ¶ 8.) Sweetser again declined. (Sweetser Dec. at ¶ 11; Cross Dec. at ¶ 8.) Sweetser alleges he did not feel compelled to accept these offers, wanted to move on with his career, and thought MediaAlpha presented him with better opportunities. (See Sweetser Dec. at ¶¶ 9–11.) He also claims that after refusing these offers, Katch's CEO threatened to tie Sweetser up in litigation to prevent him from working for MediaAlpha. (Id. at ¶ 12.)

Both Sweetser and MediaAlpha acknowledge he is bound by the Confidentiality Agreement and may not disclose or use Katch's confidential or trade secret information. (Sweetser Dec. at ¶¶ 13, 17; Cramer Dec. at ¶ 7; Declaration of Steve Yi ("Yi Dec.") at ¶¶ 2–3 [Doc. No. 22].) MediaAlpha has specifically forbidden Sweetser from using such information during his employment.[9] (Sweetser Dec. at ¶ 13; Yi Dec. at ¶¶ 2–4.) Furthermore, Sweetser and MediaAlpha allege that MediaAlpha's platform ("MediaAlpha's Platform") for connecting advertisers and publishers is different from Katch's such that any confidential information from Katch will be minimally useful to MediaAlpha. (See Yi Dec. at ¶¶ 5–11; Sweetser Dec. at ¶ 13.) Specifically, MediaAlpha's Platform allows advertisers to "dynamically and transparently bid for every ad placement" meaning advertisers bid "on a publisher-by-publisher basis" and

---

[9] Katch does not find these reassurances persuasive because it claims MediaAlpha's executives have been sued for misappropriation of trade secrets in the past. (Declaration of Patrick Quigley at ¶ 3 [Doc. No. 31].) However, the Court notes that the suit Katch references was dismissed with no finding of wrongdoing. See Oversee.net v. Fareloop, LLC et. al., Civ. No. BC4388893, order dated Jan. 21, 2011, Superior Court, Los Angeles County, California.

control the amount bid to each publisher.  (Yi. Dec. at ¶ 11.)  In essence, MediaAlpha alleges that its Platform allows advertisers to decide who the "quality" publishers are and structure their ad bids accordingly.  (See id. at ¶¶ 10–11.)

Katch disputes this characterization of the difference between Katch's and MediaAlpha's Platforms.  (See Second Supplemental Declaration of Patrick Cross ("Second Supp. Cross Dec.") [Doc. No. 30].)  Specifically, it alleges MediaAlpha "ultimately controls the transaction [between advertisers and publishers] and receives a portion of the payment," just as Katch does.  (Second Supp. Cross Dec. at ¶ 5.) "MediaAlpha's publishers do not know what advertisers pay, and advertisers do not know what publishers are paid.  That is the same as Katch's platform.  There is no meaningful difference."  (Id. at ¶ 4.)  Thus, Katch contends the Confidential Information is extremely valuable to MediaAlpha as it would allow MediaAlpha to out-bid Katch, acquire better publishers, and divert advertisers.  (See Compl. at ¶¶ 26–27, 50; Cross Dec. at ¶¶ 5, 10.)

### C. Procedural Background

Based on the aforementioned facts, Katch brought suit against Sweetser alleging breach of contract, and threatened misappropriation of trade secrets, (Compl. at ¶¶ 46–69).  Katch filed its Motion shortly thereafter.  Katch asks Sweetser be enjoined from:

1. For a period of One Hundred and Twenty (120) days, performing for MediaAlpha, LLC ("MediaAlpha") the same or similar services he provided for Katch in the health insurance, life insurance and Medicare vertical;

2. Using, communicating, disclosing, divulging or furnishing Katch's Margin Information, to any person, firm, corporation, association, or

other entity for any reason or purpose;

3. Communicating, disclosing, divulging or furnishing any of Katch's confidential and proprietary information or trade secrets, to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever so long as the information retains its confidentiality and value; and

4. Interfering with Katch's current prospective business relations.

(Motion at 1.)  Katch further asks that Sweetser be required to:

1. For a period of One Hundred and Twenty (120) days, cease employment with MediaAlpha in any capacity that is the same or similar capacity as his employment with Katch, specifically for the health insurance, life insurance and Medicare vertical; and

2. Preserve all documents and data of any nature whatsoever, including but not limited to electronic documents, electronic mail, and corporate documents of or relating to Katch, and prohibiting Sweetser from destroying any documents or data of any nature whatsoever during the pendency of this action.

(Id. at 2.)  Lastly, Katch asks the Court to allow expedited discovery "without the need to engage in the meet and confer process under Rule 26 of the Federal Rules of Civil Procedure."  (Id.)

Katch filed a brief in support of its Motion.  (Plaintiff's Memorandum of Law in Support of Its Motion for a Preliminary Injunction ("Memo.") [Doc. No. 7].)  Sweetser filed a brief in opposition, (Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for a Temporary Injunction ("Resp.") [Doc. No. 19].), and Katch duly submitted a reply, (Plaintiff's Reply Memorandum of Law ("Reply") [Doc. No. 29].)  A hearing on the Motion was held on October 29, 2015.  In essence, Katch claims that Sweetser, in his new position with MediaAlpha, will inevitably disclose Katch's Confidential Information

in violation of the Confidentiality Agreement and the Minnesota Uniform Trade Secrets Act ("MUTSA").  (See Compl. at ¶¶ 46–69; see generally Memo.; Reply.)  Importantly, Katch does not allege that Sweetser took any confidential documents or materials, only that he knows the Confidential Information by virtue of having worked with it regularly. (See Compl. at ¶¶ 13, 31; Cross Dec. at ¶¶ 3, 6; Supp. Cross Dec. at ¶¶ 2–4, 11.)  Nor does Katch claim any disclosure of the Confidential Information has actually occurred, only that disclosure of the Confidential Information is inevitable because of Sweetser's knowledge and his pending position with MediaAlpha.[10]  (See Compl. at ¶¶ 56–57, 64.)

## II.    DISCUSSION

### A. Legal Standard for Preliminary Injunctions

Preliminary injunctions are intended to prevent irreparable harm and preserve the status quo during the pendency of litigation.  Kansas City S. Transp. Co. v. Teamsters Local Union #41, 126 F.3d 1059, 1066 (8th Cir. 1997).  "A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  In deciding whether a preliminary injunction is warranted, courts consider: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest."  Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981)

---

[10] At the hearing, Katch's counsel made reference to a recent incident where a particular publisher allegedly moved its business from Katch to MediaAlpha.  However, no evidence was presented to support this contention, or link the move to any disclosure of Confidential Information by Sweetser.

(these factors are commonly referred to as the "Dataphase Factors").  The party seeking the preliminary injunction bears the burden of proof as to the Dataphase Factors. Chlorine Inst., Inc. v. Soo Line R.R., 792 F.3d 903, 914 (8th Cir. 2015).  The Court addresses each Dataphase Factor in turn below.

### B.  Likelihood of Success on the Merits

An injunction cannot issue if there is little or no chance of success on the merits. Mid-Am. Real Estate Co. v. Iowa Realty Co., 406 F.3d 969, 972 (8th Cir. 2005). "Therefore, in order to obtain a preliminary injunction, the moving party must show that it has a 'fair chance of prevailing' on its claims."  In re Medtronic, Inc. Derivative Litig., 68 F. Supp. 3d 1054, 1060 (D. Minn. 2014) (quoting Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008)).  The moving party need not show a "greater than fifty percent likelihood" of success, but must demonstrate its claims provide "fair ground for litigation."  Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003).  "While no single [Dataphase] factor is determinative, the probability of success factor is the most significant."  Home Instead, Inc. v. Florance, 721 F.3d 494, 497 (8th Cir. 2013) (quotations and citations omitted).

### 1.  Choice of law provision in the Confidentiality Agreement

As an initial matter, the Court must address a choice of law provision in the Confidentiality Agreement between Sweetser and Katch.  That provision reads:

> This Agreement will be governed by and construed according to the laws of the State of California, as such laws are applied to agreements entered into and to be performed entirely within California between California residents. [Sweetser] hereby expressly consent[s] to the personal jurisdiction of the state and federal courts located in Los Angeles, California for any lawsuit

> filed there against [him] by [Katch] arising from or related to this
> Agreement.

(Confidentiality Agreement at 4.)   The parties agree that pursuant to this provision,

California law governs Katch's breach of contract claim against Sweetser.   However,

Sweetser argues that this choice of law provision also means that California law governs

any trade secrets claim Katch might assert against him.   (Resp. at 14–16.)   Katch,

however, claims that Sweetser owes it independent tort duties under the MUTSA and this

"narrow" choice of law provision does not govern its statutory trade secrets claim.

(Reply at 7–11.)   Whether California or Minnesota law applies to Katch's trade secrets

claim is important because California categorically rejects the "inevitable disclosure"

doctrine on which that claim is based.   See Whyte v. Schlage Lock Co., 101 Cal. App.

4th 1443, 1463 (Cal. Ct. App. 2002) ("Lest there be any doubt about our holding, our

rejection of the inevitable disclosure doctrine is complete.")

    A federal court sitting in diversity employs the choice of law principles of the

forum state when deciding whether a contractual choice of law provision applies.   Florida

State Bd. of Admin. v. Law Eng'g & Envtl. Servs., Inc., 262 F. Supp. 2d 1004, 1012 (D.

Minn. 2003).   Minnesota generally enforces choice of law provisions, applying the

substantive law agreed to by the parties.   See Schwan's Sales Enters., Inc. v. SIG Pack,

Inc., 476 F.3d 594, 596 (8th Cir. 2007); Milliken & Co. v. Eagle Packaging Co., 295

N.W.2d 377, 380 n.1 (Minn. 1980).   In some cases, contractual choice of law provisions

also govern tort claims related to the contract:

> Where a plaintiff's tort claims are closely related to the interpretation of the
> contract and fall within the ambit of the express agreement, those tort

claims are also properly subject to the contract's choice of law clause.  In
other words, under Minnesota law, if analysis of the claims connected to a
contract involves interpretation of the contract, then the forum will apply
the contractual choice-of-law provisions to the tort claims.

Superior Edge, Inc. v. Monsanto Co., 964 F. Supp. 2d 1017, 1031–32 (D. Minn. 2013).

(quotations and citations omitted).  When deciding the scope of a choice of law provision,

the Court employs ordinary principles of contract interpretation, giving unambiguous

language its plain and ordinary meaning.  Bus. Bank v. Hanson, 769 N.W.2d 285, 288

(Minn. 2009).

Where a choice of law provision is broadly worded to include any and all claims

arising out of the contract, it applies to the plaintiff's related tort claims.  See Superior

Edge, 964 F. Supp. 2d at 1032–33 (holding that a choice of law provision which stated

Missouri law applied to "any dispute arising from the performance or breach" of the

contract applied to some of plaintiff's claims, including misappropriation of trade

secrets);  Khoday v. Symantec Corp., No. 11-cv-180 (JRT/TNL), 2014 WL 1281600, at

*19–21 (D. Minn. Mar. 13, 2014) (finding that choice of law provisions which read

"[a]ny and all claims or disputes relating to the Services shall be governed by the laws of

the State of Minnesota," and "[y]ou agree that all matters relating to your access to, or

use of, this web site shall be governed by the laws of California," applied to all of the

plaintiffs' consumer protection claims against the defendants).  Even more narrowly

tailored choice of law language may still be broad enough to necessitate application to

related tort claims.  See Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc., 111 F.3d

1386, 1392 (8th Cir. 1997) (holding the plaintiff's claims for negligent performance,

misrepresentation, deceptive trade practices, and unjust enrichment were governed by Minnesota law because those claims were "closely related to the interpretation of the contracts" where the choice of law provision stated that the "Agreement shall be deemed entered into within and shall be governed by and interpreted in accordance with the laws of the State of Minnesota").  Language directing that an agreement be construed in accordance with the laws of a particular state can mean that provision controls the law applicable to a closely related tort claim.  See Warren E. Johnson Cos. v. Unified Brand, Inc., 735 F. Supp. 2d 1099, 1104–06 (D. Minn. 2010) (finding a clause stating that the "Agreement will be construed in accord with the laws of Mississippi" governed those statutory and tort claims that were "closely related to the contract's terms").  But see Inacom Corp. v. Sears, Roebuck & Co., 254 F.3d 683, 687–88 (8th Cir. 2001) (holding a choice of law clause reading "[the] Agreement shall be governed by and construed in accordance with the law of the State of Illinois, as applied to contracts made and to be performed solely within such state" did not apply to the plaintiff's fraudulent concealment claim regarding the formation of the contract).

Where the plaintiff's tort claim requires interpreting a related contract's terms, a choice of law provision within the agreement also governs the tort claim.  See Warren E. Johnson, 735 F. Supp. 2d at 1106 (holding that because the plaintiff's Minnesota Termination of Sales Representative Act claim required interpreting a contract clause defining "good cause," the contractual choice of law provision governed what law applied to that statutory claim); see also Superior Edge, 964 F. Supp. 2d at 1032–33 (finding a contractual choice of law provision applied to the plaintiff's misappropriation

15

of trade secrets claim because the claim "will require the Court to interpret the scope of the confidentiality provision and the assignment of intellectual property rights and licenses under the Agreement").

The Confidentiality Agreement between Sweetser and Katch explicitly lists "trade secrets" as confidential information covered by the agreement's terms. The Confidentiality Agreement expressly states that it is to "be governed by and construed according to" the laws of the state of California. Furthermore, it requires Sweetser to consent to personal jurisdiction in California for claims "arising from or related to this Agreement." On these facts, there is a strong argument to be made that Katch's misappropriation of trade secrets claim closely relates to the Confidentiality Agreement and requires interpretation of its terms[11] such that the choice of law provision applies. However, the Court need not definitively decide this issue here. It is enough to note that if the choice of law provision applies, California law would entirely foreclose Katch's misappropriation claim because it does not recognize the inevitable disclosure doctrine.[12]

---

[11] A claim for misappropriation requires a showing that the trade secret was acquired by "improper means." Minn. Stat. § 325C.01, subd. 3; Cal. Civ. Code § 3426.1(b). Improper means include various illegals acts as well as "breach . . . of a duty to maintain secrecy," such as the duty created by the Confidentiality Agreement. See Minn. Stat. § 325C.01, subd. 2; Cal. Civ. Code § 3426.1(a). Thus, the Court would have to interpret the Confidentiality Agreement to determine the scope of Sweetser's duty to maintain the secrecy of Katch's Confidential Information.

[12] California trade secrets law does recognize a claim for threatened misappropriation consisting of (1) a trade secret, (2) held by a defendant, (3) who intends to improperly use or disclose the trade secret. Cent. Valley Gen. Hosp. v. Smith, 162 Cal. App. 4th 501, 528 (Cal. Ct. App. 2008). However, "the issuance of an injunction based on a claim of threatened misappropriation requires a greater showing than mere possession by a defendant of trade secrets where the defendant acquired the trade secret by proper

See Whyte, 101 Cal. App. 4th at 1463.  This reduces the likelihood of Katch succeeding on the merits and thus weighs against granting Katch preliminary injunctive relief.

### 2.  Misappropriation of trade secrets under Minnesota law

Even if Minnesota law governs Katch's misappropriation of trade secrets claim, Katch is unlikely to succeed on the merits.  Trade secrets laws are meant to be a shield to preserve the trust in confidential relationships, "not a sword to be used by employers to retain employees by the threat of rendering them substantially unemployable in the field of their experience . . . ." E.W. Bliss Co. v. Struthers-Dunn, Inc., 408 F.2d 1108, 1112– 13 (8th Cir. 1969).  "A claim of trade secret misappropriation should not act as an ex post facto covenant not to compete." Int'l Bus. Mach. Corp. v. Seagate Tech., Inc., 941 F. Supp. 98, 101 (D. Minn. 1992) (citing E.W. Bliss, 408 F.2d at 1112–13).  To show a likelihood of success on the merits for a claim of misappropriation under the MUTSA, a plaintiff must demonstrate **both** that the information at issue qualifies as a trade secret and that this information has or will be misappropriated.  See Int'l Bus. Mach., 941 F. Supp. at 100–01; Lexis-Nexis v. Beer, 41 F. Supp. 2d 950, 958 (D. Minn. 1999).

### a.  Trade secrets under MUTSA

Whether Katch's Confidential Information qualifies as a trade secret is questionable.  The MUTSA defines a trade secret as information that:

(i) derives independent economic value, actual or potential, from not being

---

means." Id.  On the present record, it appears Sweetser acquired knowledge of Katch's Confidential Information through proper means.  Moreover, there is no evidence to suggest Sweetser intends to disclose the Confidential Information.  Thus, Katch's ability to establish a claim for threatened misappropriation of trade secrets under California law is doubtful.

> generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Minn. Stat. § 325C.01, subd. 5.  Information which is generally known to the public or within an industry, or is readily ascertainable, is not a trade secret.  Lexis-Nexis, 41 F. Supp. 2d at 958.  Similarly, information that has or will quickly become obsolete does not have the independent economic value to be considered a trade secret.  Id.  Customer lists, pricing information, long-term sales strategies, and customer buying habits do not necessarily constitute trade secrets.  See United Products Corp. of Am. v. Cederstrom, No. A05-1688, 2006 WL 1529478, at *5 (Minn. Ct. App. June 6, 2006) (finding this sort of information was not a trade secret under MUTSA); Reliastar Life Ins. Co. v. KMG Am. Corp., No. A05-2079, 2006 WL 2529760, at *4 (Minn. Ct. App. Sept. 5, 2006) (holding that customer lists and information are generally not deemed trade secrets, unless it can be shown they meet the elements of the MUTSA).

Katch argues its Confidential Information qualifies as a trade secret because it is not generally known or ascertainable, has independent economic value from its secrecy, and because Katch has made reasonable efforts to maintain that secrecy.  (See Memo. at 11–15.)  The Court does not see this issue to be so clear-cut.  For instance, the identity of publishers appears to be readily known or ascertainable within the online advertising industry.  (See Sweetser Dec. at ¶¶ 6, 18 (describing his accumulation of knowledge about which publishers work with Katch, MediaAlpha, and other competitors and

claiming "the identity of publishers is well known to or easily ascertainable by anyone working in this space"); Cramer Dec. at ¶ 11 (describing knowledge of publishers that individuals like Sweetser and Cramer accumulate over their careers, as well as online tools a company can use to identify where publishers are sending their business).) Although the identity of those whom Katch considers to be Quality Publishers, as determined by the Katch Platform, may possibly be a trade secret, the general identity of these publishers, or the fact they do business with Katch, are unlikely to be considered trade secrets.    Moreover, if MediaAlpha's Platform allows advertisers, and not MediaAlpha, to determine who the "quality" publishers are, knowledge of Katch's Quality Publishers is of little value.

Similarly, the amount Katch pays its publishers is of questionable independent economic value.  Katch, Sweetser, and MediaAlpha all agree that any salesperson can simply ask a publisher what it will take to move its business from one platform to another.  (Sweetser Dec. at ¶ 18; Cramer Dec. at ¶¶ 8–9; Reply at 3–4.)  According to Katch, the single most important consideration for a publisher in deciding whether to move to a new platform is the average revenue per query it receives.  (Cross Dec. at ¶ 5; Supp. Cross Dec. at ¶ 7; see Reply at 3.)  Although this price is undoubtedly important to the publisher's decision,   MediaAlpha contends other factors such as "ad creativity" and the number of ads displayed at one time on the publisher's site play a role in the publisher's decision. (Yi Dec. at ¶¶ 12–14.)  If these other factors motivate publishers to select a particular platform, and the Katch and MediaAlpha Platforms differ with respect to these factors (see id.), the value of knowing Katch's pricing information is reduced.

Similarly, if MediaAlpha simply does not have "quality" advertisers, meaning they pay too little to allow MediaAlpha to give the publisher the average revenue per query it desires, knowledge of what Katch pays its publishers per query is of little value. (See id. at ¶ 13.)

Furthermore, whatever Confidential Information Sweetser knows is more than a month old. The parties dispute whether the average price paid per query to publishers changes regularly or not. (See Supp. Cross Dec. at ¶ 10 (alleging this amount changes very slowly and very little); Yi Dec. at ¶ 16 (arguing this amount changes quickly and fluctuates a significant amount); Sweetser Dec. at ¶ 17 (asserting whatever information he knows about Katch's margin and pricing information is likely stale because such information changes regularly).) If this sort of information does change regularly, what Sweetser knows may already be stale, or soon become so. See Fox Sports Net N., L.L.C. v. Minnesota Twins P'ship, 319 F.3d 329, 336 (8th Cir. 2003) (finding outdated financial information obsolete and holding that "obsolete information cannot form the basis for a trade secret claim because the information has no economic value"); Lexis-Nexis, 41 F. Supp. 2d at 959 (declaring four month old knowledge of corporate business policies and strategies to be of little value and thus not a trade secret).

Again, the Court need not decide whether the Confidential Information is in fact a trade secret under MUTSA. It is enough to note that the issues discussed above reduce Katch's likelihood of success on the merits and thus its entitlement to preliminary injunctive relief.

### b.  Threatened misappropriation and the inevitable disclosure doctrine

20

To succeed on its misappropriation claim, Katch must also show the Confidential Information has or will be misappropriated through its improper disclosure or use. However, Katch stands little, if any, chance of establishing such disclosure, even employing the inevitable disclosure doctrine.

Minnesota Statute § 325C.02(a) allows for injunctive relief even where there is only a threat of misappropriation.  See Reliastar Life Ins., 2006 WL 2529760 at *4. However, where the misappropriation is merely threatened, "the moving party must demonstrate 'a high degree of probability of inevitable disclosure.'"[13]  Id. (quoting Lexis–Nexis, 41 F. Supp. 2d at 958).  This is a heavy burden.[14]  Honeywell Int'l Inc. v. Stacey, No. 13-cv-3056 (PJS/JJK), 2013 WL 9851104, at *6 (D. Minn. Dec. 11, 2013). Mere knowledge of a trade secret is not enough, even where the person with such knowledge takes a comparable position with a competitor.  Int'l Bus. Mach., 941 F. Supp. at 101.  "[A]n injunction may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights . . . injunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties."  Id.

---

[13] This is commonly known as the inevitable disclosure doctrine.  See PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1268 (7th Cir. 1995).  Although Minnesota courts have not explicitly adopted or rejected the doctrine, those to consider it have universally employed the "high degree of probability" standard.  See United Products Corp., 2006 WL 1529478 at *5; Int'l Bus. Mach., 941 F. Supp. at 101); Surgidev Corp. v. Eye Technology, Inc., 648 F.Supp. 661, 695 (D. Minn. 1986) aff'd, 828 F.2d 452 (8th Cir. 1987); Honeywell Int'l Inc. v. Stacey, No. 13-cv-3056 (PJS/JJK), 2013 WL 9851104, at *6 (D. Minn. Dec. 11, 2013).

[14] Notably, the Court cannot find a single instance of a moving party meeting the high probability of inevitable disclosure standard and receiving injunctive relief on that basis in Minnesota.

21

(quotations omitted).

Two cases with marked factual similarities to the matter at bar illustrate why Katch fails to establish the high probability of inevitable disclosure necessary to show a likelihood of success on the merits.  The first is <u>Honeywell</u>, where the Court denied a preliminary injunction because a former employer failed to show a likelihood of establishing inevitable disclosure of trade secrets. 2013 WL 9851104.

The defendant ("Stacey") was a national account manager for Honeywell.  <u>Id.</u> at *1.  In this position, Stacey had considerable access to and knowledge of Honeywell's commercial-distribution system, customers, and plans regarding product development and release.  <u>See id.</u> at *1–3.  Stacey was bound by an employee agreement that forbade him from misappropriating, using, or disclosing Honeywell's "Trade Secrets, Proprietary and Confidential Information," which the agreement defined as, "methods of doing business, customer lists, customer usages or requirements, [and] supplier information." <u>Id.</u> at *4.  The agreement also forbade Stacey from soliciting existing Honeywell customers or, for two years, working at a job wherein "it could be reasonably anticipated that [Stacey] would disclose Honeywell's Trade Secrets, Proprietary and Confidential Information." <u>Id.</u> at *4–5.

Stacey left his job and accepted a position with a Honeywell competitor, Nest Labs ("Nest").  <u>Id.</u> at *1.  Nest, although considerably smaller in size, was a competitor of Honeywell.  <u>Id.</u> at *2.  Stacey's job responsibilities at Nest included developing a commercial-distribution channel like the one at Honeywell, leading Nest's sales team, and soliciting customers for Nest products similar to those distributed by Honeywell.  <u>Id.</u>

at *3.

Honeywell brought claims against Stacey alleging breach of contract and misappropriation of Honeywell's trade secrets.  Id. at *5.  It sought an injunction barring Stacey from working for Nest in the portion of that company that competed with Honeywell, and from soliciting Honeywell customers, suppliers, and vendors.  Id. at *1. Because there was no evidence that Stacey actually misappropriated any trade secrets, Honeywell instead argued that he would inevitably misappropriate them in the course of performing his new job.  Id. at *5.

The Court clarified that "this is not a case in which a departing employee stole documents" and that whatever trade secrets Stacey "possesses in his head . . . he cannot help but take with him."  Id. at *6.  The Court was unpersuaded by Honeywell's assertion that the similarity of Stacey's responsibilities in his new job meant that he will inevitably disclose Honeywell's trade secret information.  "[M]erely possessing trade secrets and holding a comparable position with a competitor does not justify an injunction."  Id. (citing Reliastar Life Ins., 2006 WL 2529760 at *6).  Since Honeywell and Nest were differently situated in the market, both in size and sales approach, the Court found information about Honeywell's marketing and distributions strategies would have little or no direct application for Nest, despite the fact Nest intended to develop a commercial-distribution channel like Honeywell.  See id. at *2, 3, 6.  The Court acknowledged that Nest might find the information Stacey knew about Honeywell's marketing and distribution strategies interesting or useful, but this was not enough to show the high probability of inevitable disclosure necessary to establish a likelihood of success on the

merits.  Id. at *7.

Here, Katch offers no evidence Sweetser improperly acquired any of Katch's Confidential Information or that any disclosure of that information has occurred.  Instead, it argues that because Sweetser has the Confidential Information "in his head" and his position with MediaAlpha is substantially similar to the one he held with Katch, disclosure of the Confidential Information is inevitable.  The Platforms employed by MediaAlpha and Katch are different to some extent, a difference MediaAlpha claims makes Katch's Confidential Information of little use.  Although Katch vehemently disputes this contention, it is enough to note that if MediaAlpha is correct about the difference, it significantly reduces the risk of inevitable disclosure and thus Katch's likelihood of success on the merits.  Even if MediaAlpha might find the Confidential Information interesting or useful, Sweetser avers he will not disclose it, and MediaAlpha states it would not use the Confidential Information.[15]  Here, as in Honeywell, "[Katch] has not shown a high probability that [Sweetser] will inevitably use or disclose such information in the course of his work for [MediaAlpha]."  2013 WL 9851104 at *7.

---

[15] These facts also provide a critical point of distinction with PepsiCo, Inc. v. Redmond, 54 F.3d 1262 (7th Cir. 1995), a case heavily relied on by Katch.  (See Memo. at 15–18.)  In PepsiCo, the Seventh Circuit upheld a preliminary injunction where a former employee would inevitably rely on his former employer's trade secret information in his new position **and** there was reason to believe neither the former employee, nor his new employer, were willing to preserve the confidentiality of those trade secrets.  54 F.3d at 1271.  Here, there is no reason to believe Sweetser and MediaAlpha are not sincere in, or capable of abiding by, their promises.  See H & R Block E. Tax Servs., Inc. v. Enchura, 122 F. Supp. 2d 1067, 1075 (W.D. Mo. 2000) (noting the dual basis for PepsiCo's holding and denying the plaintiff's inevitable disclosure argument in part because there was no indication of an unwillingness by the former employee and his new employer to preserve confidentiality).

The second factually similar case is <u>United Products Corp.</u>  There, a roofing and siding distributor ("UPC") appealed the district court's refusal to enjoin a former employee ("Cederstrom") and his new employer ("Alcoa") from violating a non-compete agreement between UPC and Cederstrom and from violating the MUTSA.  <u>United Products Corp.</u>, 2006 WL 1529478 at *1.  Cederstrom was a salesperson for UPC, but also had experience in the roofing and siding business through his family and previous positions with other distributors.  <u>Id.</u>  As a salesperson for UPC, Cederstrom had access to confidential information such as customer lists, customer financial information, UPC's pricing information, sales strategies, and the discounts it offered vendors.  <u>Id.</u>  According to UPC, this information would allow Cederstrom "to improve a competitor's proposal" and divert business from UPC.  <u>Id.</u>  As a result, UPC required Cederstrom to sign a confidentiality, non-solicitation, and non-compete agreement.  <u>Id.</u>

Cederstrom resigned from UPC and went to work as a district salesperson for Alcoa, a distributor of siding and competitor of UPC.  <u>Id.</u>  However, Alcoa carefully structured Cederstrom's responsibilities and sales territory so they did not violate Cederstrom's non-compete and non-solicitation agreement, and directed Cederstrom not to use or disclose any of UPC's confidential information.  <u>See id.</u> at *2.  Cederstrom alleged he did not remember most of UPC's confidential information and there was no evidence he took any of that information, other than what he did remember, upon leaving UPC.  <u>Id.</u>  UPC sued Cederstrom and Alcoa, seeking injunctive relief, alleging breach of contract, violation of the MUTSA, and other claims.  <u>Id.</u>

The Minnesota Court of Appeals first noted that UPC failed to provide sufficient

information to classify its customer lists, pricing information, and sales strategies as trade secrets under the MUTSA. Id. at *5. The Court also found that UPC failed to demonstrate a high probability of inevitable disclosure. Id. UPC produced no evidence that Cederstrom took confidential information, or that he had disclosed anything he remembered. Id. The Court stated, "[t]he moving party may not use an injunction 'simply to eliminate a possibility of a remote future injury, or a future invasion of rights,' and 'injunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties.'" Id. (quoting Int'l Bus. Mach. Corp., 941 F. Supp. at 101). Ultimately, the Court upheld the district court's denial of UPC's requested injunctive relief. Id. at *6.

Here, Sweetser is quite similar to Cederstrom. Sweetser alleges he does not remember precise details about much of Katch's Confidential Information. (Sweetser Dec. at ¶ 14.) Although Katch disputes this contention, if true, it weakens Katch's inevitable disclosure theory. Sweetser also describes how his time working at online advertising platforms other than Katch gave him insight into the online advertising platform industry and how to locate and attract publishers. (See Sweetser Dec. at ¶ 5.) Furthermore, there is no allegation that Sweetser actually took any documentation or materials, other than what he does remember from his work at Katch. MediaAlpha is also much like Alcoa in United Products Corp. It has specifically instructed Sweetser not to use or disclose any of Katch's Confidential Information. MediaAlpha further claims that differences in the MediaAlpha Platform would make Katch's Confidential Information of limited value, much like Alcoa's placement of Cederstrom in a different

sales territory decreased the likelihood he would use any of UPC's confidential information.

Lastly, the fact that two other former Katch employees went to work for MediaAlpha—and no claim of misappropriation of trade secrets or breach of contract was asserted against them—suggests that disclosure of Katch's Confidential Information is not inevitable.  See Int'l Bus. Mach. Corp., 941 F. Supp. at 101 (where a former employee worked for new employer for six months before the former employer brought misappropriation claim, this suggested disclosure was not inevitable).  Cramer claims both he and Foster knew Katch's Confidential Information (as it existed then) when they left to work for MediaAlpha.  (Cramer Dec. at ¶¶ 7, 14.)  He also asserts that he has not disclosed this information, nor was such disclosure necessary for him to perform his job duties with MediaAlpha.  (Id. at ¶ 7.)  Katch does not contend that Cramer disclosed any Confidential Information, but instead argues Cramer had less exposure to that information because he "operated at a higher level" than Sweetser.  (See Second Supp. Cross Dec. at ¶ 3.)  However, what matters here is that Cramer (and potentially Foster) was familiar with Katch's Confidential Information, went to work for MediaAlpha in a position comparable to the one he held at Katch, and yet no disclosure of Katch's Confidential Information is alleged.  This suggests that Sweetser, following a similar path, does not make disclosure of Katch's Confidential Information inevitable.

Katch fails to show the high degree of probability of inevitable disclosure necessary to invoke that doctrine.  Katch has merely shown that Sweetser may remember some of its Confidential Information and plans to take a comparable position with its

competitor, MediaAlpha.[16] This is not enough. See Int'l Bus. Mach. Corp., 941 F. Supp. at 101 ("Merely possessing trade secrets and holding a comparable position with a competitor does not justify an injunction."). "Minnesota courts do not grant injunctive relief solely because a former employer presumes that disclosure and solicitation are inevitable." United Products Corp., 2006 WL 1529478 at *5. The Court will not use an injunction "simply to eliminate a possibility of a remote future injury, or a future invasion of rights" or to allay Katch's fears and anxieties about Sweetser working for MediaAlpha. See Int'l Bus. Mach. Corp., 941 F. Supp. at 101.

### 3. Breach of contract under California law[17]

In what is essentially a minor modification of its inevitable disclosure argument, Katch contends Sweetser will inevitably breach the Confidentiality Agreement by working for MediaAlpha in a position similar to the one he held at Katch. (See Memo. at 20–21.) For reasons similar to those just discussed, Katch has not shown a likelihood of success on its breach of contract claim. See Honeywell, 2013 WL 9851104 at *8 (Honeywell conceded its breach of contract claim was basically a replica of its misappropriation of trade secrets claim and the Court thus found it unlikely to succeed on the merits for similar reasons).

Under California law, a claim for breach of contract consists of: (1) the existence of a valid agreement; (2) the plaintiff's performance or excusable nonperformance; (3)

---

[16] Something Sweetser was permitted to do since he was not bound by any non-compete agreement.

[17] See supra Part II.B.1 (discussing the Confidentiality Agreement's choice of law provision and its applicability to Katch's breach of contract claim).

28

the defendant's breach; and, (4) resulting damages to the plaintiff.  Oasis W. Realty, LLC v. Goldman, 51 Cal. 4th 811, 821 (Cal. 2011).   A contract may be breached by nonperformance, repudiation (often known as "anticipatory breach"), or a combination thereof.  Cent. Valley Gen. Hosp. v. Smith, 162 Cal. App. 4th 501, 514 (Cal. Ct. App. 2008).  Repudiation may be express or implied.  Cent. Valley Gen. Hosp., 162 Cal. App. 4th at 514.  "An implied repudiation results from conduct where the promisor puts it out of his power to perform so as to make substantial performance of his promise impossible . . . ."  Id. (quotations and citations omitted).

Here, the only contested element is whether Sweetser breached the Confidentiality Agreement.   Katch does not allege that Sweetser has actually breached the Confidentiality Agreement, but instead argues such a breach "is certain" because of the position Sweetser will occupy at MediaAlpha.  (See Memo. at 21; Compl. at ¶ 64.)  The Court construes this as an argument that Sweetser, by declaring his intent to work for MediaAlpha, is anticipatorily breaching the Confidentiality Agreement.   The problem with this argument is that Sweetser has not expressly or implicitly repudiated the contract.   Although Sweetser disagrees with Katch's definition of what is protected information under the Confidentiality Agreement, he has repeatedly declared his intent to abide by the contract.  (See Sweetser Dec. at ¶¶ 13–14, 16–18.)  Moreover, Sweetser has done nothing that would "put it outside his power to perform" under the Confidentiality Agreement.  As explained throughout this opinion, it is possible for Sweetser to work for MediaAlpha while also abiding by the law and the Confidentiality Agreement.  Without more, this Court cannot conclude that Katch has shown a likelihood of success on the

merits of its breach of contract claim.  See Purdum v. Wolfe, No. C-13-04816 DMR, 2014 WL 171546, at *6 (N.D. Cal. Jan. 15, 2014) (denying the plaintiff's request for preliminary injunctive relief in part because it failed to establish a likelihood of success on the merits of its breach of contract claim where the evidence of repudiation was unclear and conflicting); Encompass Holdings Inc. v. Daly, No. C-09-1816 PJH, 2009 WL 1561580, at *6–7 (N.D. Cal. June 3, 2009) (same).

Katch fails to establish a likelihood of success on the merits for either of its claims against Sweetser.  This failure alone warrants denying its requested preliminary relief. See CDI Energy Servs., Inc. v. W. River Pumps, Inc., 567 F.3d 398, 402 (8th Cir. 2009) ("the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied"); Mid–America Real Estate Co. v. Iowa Realty Co., 406 F.3d 969, 972 (8th Cir. 2005) ("an injunction cannot issue if there is no chance of success on the merits").   However, in the interest of completeness, the Court will consider the other Dataphase Factors, all of which weigh against granting Katch preliminary injunctive relief.

### C. Irreparable Harm

To receive injunctive relief, the moving party must also show it faces a sufficient threat of irreparable harm.  Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir. 1999).   The speculative threat of such harm is not an appropriate basis for an injunction. Cargill, Inc. v. Hartford Acc. & Indem. Co., 531 F. Supp. 710, 715 (D. Minn. 1982); see Int'l Bus. Mach., 941 F. Supp. at 101; United Products Corp., 2006 WL 1529478 at *5; see also Marvin Lumber & Cedar Co. v. Severson, No. 15-cv-1869

(MJD/LIB), 2015 WL 5719502, at *9 (D. Minn. Sept. 28, 2015) (finding the "inferred" harm attributable to a former employee breaching a restrictive covenant is merely speculative harm where the former employee has yet to breach the covenant). Irreparable harm is that which cannot be adequately compensated through a monetary award. See Watkins, 346 F.3d at 845–46.

Normally, "lost profits and lost business can be readily calculated and redressed through monetary relief." Cenveo Corp. v. S. Graphic Sys., Inc., No. 08-cv-5521 (JRT/AJB), 2009 WL 161210, at *3 (D. Minn. Jan. 22, 2009); see also Sierra Petroleum Co. v. Pats 66, Inc., No. 07-cv-1112 (DWF/AJB), 2007 WL 1057055, at *3 (D. Minn. Apr. 6, 2007) (holding that harm to business reputation and competitive position resulting from reduction in customer traffic was compensable by money damages and thus not irreparable harm). However, lost profits that are difficult to quantify may constitute irreparable harm. Bison Advisors LLC v. Kessler, No. 14-cv-3121 (DSD/SER), 2014 WL 5489289, at *4 (D. Minn. Oct. 30, 2014). The moving party bears the burden of showing lost profits would be difficult to quantify such that money damages would be difficult to ascertain. Id. Without this showing, there can be no finding of irreparable harm warranting injunctive relief. Id.; see Ploy-Wal Int'l, Inc. v. Metro Home Insulation, Inc., No. cv. 4-96-461 (ADM), 1997 WL 563174, at *5 (D. Minn. Jan. 6, 1997) ("Plaintiff's claim of lost profits and sales, without more, is insufficient to show irreparable harm.")

Where injunctive relief is specifically authorized by statute, it should be awarded when the elements are met and issuing injunctive relief "would fulfill the legislative

purpose." Equus Computer Sys., Inc. v. N. Computer Sys., Inc., No. 01-cv-657 (DWF/AJB), 2002 WL 1634334, at *4 (D. Minn. July 22, 2002) (quoting United States v. White, 769 F.2d 511, 515 (8th Cir. 1985)). The MUTSA specifically authorizes injunctive relief to address the threatened misappropriation of trade secrets and thus threatened misappropriation may constitute irreparable harm. See Equus Computer Sys., 2002 WL 1634334 at *4 (citing Minn. Stat. § 325C.02). However, the potential disclosure of information which is either stale, or soon to be publicly exposed, does not constitute irreparable harm. Honeywell, 2013 WL 9851104 at *7.

Katch fails to show that it faces a threat of irreparable harm sufficient to warrant injunctive relief. First, as previously explained, Katch did not establish the necessary probability of inevitable disclosure, or that Sweetser anticipatorily breached the Confidentiality Agreement. See supra Part II.B.2.b., Part II.B.3. Thus, any harm is at best speculative and cannot serve as the basis for irreparable harm. See Int'l Bus. Mach., 941 F. Supp. at 101; Severson, 2015 WL 5719502 at *9; United Products Corp., 2006 WL 1529478 at *5.

Second, Katch fails to meet its burden in showing that whatever lost revenues and profits it might face are difficult to quantify such that they constitute irreparable harm. See Bison Advisors, 2014 WL 5489289 at *4; Ploy-Wal Int'l, 1997 WL 563174 at *5. Katch claims Sweetser's alleged inevitable breach of contract and misappropriation will cause irreparable harm in the form of lost business revenue potentially resulting in millions of dollars of lost profits. (Compl. at ¶ 50; Cross Dec. at ¶ 5.) Katch contends "[t]he amount of revenue that [it] would lose would be impossible to measure with

32

specificity . . . ."  (Compl. at ¶ 50.)  However, Katch offers no explanation why these damages would be "impossible to measure" other than to say that "each transaction would have [sic] be scrutinized to establish but for causation and then the amount of lost profits would have to be calculated."  (See Memo. at 19.)  The Court does not see how this is different from the situation faced by any party claiming damages based on lost profits.

Third, there is some question as to whether the Confidential Information Sweetser does remember is stale or obsolete.  See supra Part II.B.2.a.  This fact weighs against finding irreparable harm and awarding injunctive relief.  See Lexis-Nexis, 41 F. Supp. 2d at 959; Honeywell, 2013 WL 9851104 at *7.  Lastly, this Court cannot conclude it would serve the legislative purpose of the MUTSA to grant injunctive relief based on this record, and thus no finding of irreparable harm is necessitated.  See Equus Computer Sys., 2002 WL 1634334 at *4.  Katch's failure to establish irreparable harm also merits denying its requested preliminary injunctive relief.  See Watkins, 346 F.3d at 844 ("Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction.").

### D.  Balance of Harms

When considering the balance of harms, courts must weigh "the threat to each of the parties' rights and economic interests that would result from either granting or denying the preliminary injunction."  Cenveo, 2009 WL 161210, at *4 (quotations omitted).  The goal is to assess the harm the movant would suffer absent an injunction, as well as the harm other interested parties and the public would experience if the injunction

issued.  Pottgen v. Missouri State High Sch. Activities Ass'n, 40 F.3d 926, 928 (8th Cir. 1994)

Katch claims injunctive relief is necessary to preserve the status quo.  (Memo. at 23.)  It further contends that the relief sought is minimally restrictive or harmful to Sweetser in the face of the "possibly . . . millions of dollars" in lost profits Katch would experience without such relief.  (Id. at 24.)  Katch notes that it is willing to pay Sweetser his normal salary during the time he is enjoined from working for MediaAlpha or another Katch competitor, reducing the harm to him.  (Id. at 23; Cross Dec. at ¶ 8.)

Sweetser rejects Katch's arguments that injunctive relief here would preserve the status quo, arguing that such relief would "radically alter" Sweetser's contractual obligations by imposing a judicially constructed non-compete.  (See Resp. at 30.) Furthermore, Sweetser contends that an injunction would prevent him from exercising his right to work in his profession, with the employer of his choosing, and advance his career in the process.  (See id. at 29–30.)  According to Sweetser, "[t]his harm, including the message it sends to other potential litigants, vastly outweighs any harm Katch could suffer if the injunction is not granted."  (Id. at 30.)

The Court agrees with Sweetser and finds the balance of harms weighs against Katch.  Katch's requested injunctive relief essentially bars Sweetser from pursuing his career and taking a job with MediaAlpha (possibly losing the position that was offered to him completely), or any other Katch competitor, for several months.  See Honeywell, 2013 WL 9851104 at *7 (finding the balance of harms favored denying injunctive relief where such relief would cause a former employee to lose his job).  This is not a minor

restriction, especially since Sweetser never signed any non-compete with Katch.  This Court will not allow Katch to obtain, "through the back door of trade secret law," the non-compete and non-solicitation restrictions it failed to obtain through private bargaining with Sweetser.  See Lexis-Nexis, 41 F. Supp. 2d at 959; see also Int'l Bus. Mach., 941 F. Supp. at 101 (holding trade secret laws were not meant to give employers ex post facto non-competes preventing their former employees from pursuing their chosen professions).

### E.  Public Interest

The public has a strong interest in preserving and fostering business competition. See Lasermaster Corp. v. Sentinel Imaging, a Div. of Sentinel Bus. Sys., Inc., 931 F. Supp. 628, 637 (D. Minn. 1996).  However, this same interest does not extend to unfair competition.  See Millard v. Elec. Cable Specialists, 790 F. Supp. 857, 863 (D. Minn. 1992).  Public interest favors "the enforcement of valid business agreements and the protection of legitimate business interests in an industry propelled by vigorous but fair competition."  Boston Scientific Corp. v. Duberg, 754 F. Supp. 2d 1033, 1042 (D. Minn. 2010) (quotations omitted).  However, the courts also recognize that "[a] person's right to labor in any occupation in which he is fit to engage is a valuable right, [and] should not be taken from him, or limited, by injunction, except in a clear case showing the justice and necessity therefor."  Ultra Lube, Inc. v. Dave Peterson Monticello Ford-Mercury, Inc., 2002 WL 31302981, at *6 (Minn. Ct. App. Oct. 15, 2002) (citing Standard Oil Co. v. Bertelsen, 243 N.W. 701, 703 (Minn. 1932)).

Here, the Court concludes the public interest favors denying Katch injunctive

relief. Given Katch's lack of likelihood of success on the merits, issuing the requested injunctive relief cannot be said to prevent unfair competition. Furthermore, there is no valid business agreement to enforce through a preliminary injunction. Sweetser acknowledges that he is bound by the Confidentiality Agreement and intends to follow it, while Katch failed to obtain any sort of non-compete or non-solicitation agreement from Sweetser. This Court will not issue injunctive relief that merely instructs Sweetser to abide by his legal and contractual obligations. Lastly, issuing Katch injunctive relief would infringe upon Sweetser's ability to work in his chosen profession, as well as potentially curtail legal competition within the online advertising industry.

### F. Expedited Discovery

Since the Court finds that Katch is not entitled to preliminary injunctive relief, it also declines to award Katch expedited discovery in this matter. The parties will proceed under the normal Federal Rules of Civil Procedures and in accordance with the scheduling orders of this Court.

### III.   ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff Katch's Motion for Preliminary Injunction and Expedited Discovery [Doc. No. 5] is **DENIED**.


Dated: November 10 2015              s/ Susan Richard Nelson
                                     SUSAN RICHARD NELSON
                                     United States District Judge